```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHILADELPHIA FIRE FIGHTERS'      :   CIVIL ACTION
UNION LOCAL 22, AFL-CIO, et al.  :
                                 :
          v.                     :
                                 :
CITY OF PHILADELPHIA, et al.     :   NO. 02-4653
```

MEMORANDUM

Dalzell, J.                                          October 6, 2003

       Plaintiffs challenge provisions of the City of Philadelphia's Home Rule Charter and Civil Service Regulations that prohibit uniformed Fire Department employees from making voluntary political contributions. The parties have stipulated to the relevant facts, and we here address their cross-motions for summary judgment.[1]

Factual Background

       To put the relevant legal questions in context, we first consider in some detail Philadelphia's ban on political

---

[1] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R. Civ. P. 56(e)). The task for the Court is to inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52; Tabas v. Tabas, 47 F.3d 1280, 1287 (3d Cir. 1995) (en banc).

contributions by uniformed[2] fire fighters and the fire fighters' political action committee, FIREPAC.  This canvass necessarily entails examining how the Philadelphia Fire Department is organized.

    A.   <u>The Ban</u>

The Philadelphia Home Rule Charter (the "City Charter"), the Philadelphia Civil Service Regulations, and a Fire Department policy memorandum collectively impose a ban on voluntary political contributions by some -- but not all -- employees of the Fire Department.  Since 1952, the Philadelphia Home Rule Charter has prohibited Fire Department employees from making political contributions:

> No officer or member of the Philadelphia . . . Fire Department shall pay or give any money or valuable thing or make any subscription or contribution, whether voluntary or involuntary, for any political purpose whatever.

351 Pa. Code § 10.10-107(3), <u>in</u> Stipulation, at Ex. A.  While the Civil Service Regulations focus primarily on "the establishment and administration of a merit system" for personnel decisions, Phila. Civil Service Reg. 1.01 <u>in</u> Stipulation, at Ex. B, they also explain that the Charter's facially universal ban applies only to "uniformed or investigatory" employees of the Fire

---

[2] Non-uniformed employees are also known as civilian employees, and we will use the terms interchangeably.

Department, Phila. Civil Service Reg. 29.0415, in Stipulation, at Ex. D.[3]

To alert Fire Department employees to the ban, Fire Commissioner Harold Hairston routinely reissues an internal memorandum referencing it and explaining that those who fail to respect the ban face "severe penalties," including "immediate dismissal from employment, ineligibility for one year from holding any office or position under the City, and a maximum fine of $300 or 90 days imprisonment, or both." General Memorandum #01-33 from Harold B. Hairston, Fire Commissioner to All Members, Political Activity of City Employees (Oct. 15, 2002), in Stipulation, Ex. G; Stipulation ¶ 52, Ex. G at 2, Ex. E at 10-12 (noting that Fire Commissioner Hairston reissues the memorandum annually).

    B.   The Fire Department

The Philadelphia Fire Department is divided into four Divisions: (1) Operations, (2) Technical Services, (3) Administrative Services, and (4) Emergency Medical Services. Stipulation at ¶ 32, Ex. F (organizational chart).

Staffed by both uniformed and non-uniformed employees, the Operations Division directs all field fire fighting and emergency forces, the Fire Academy, aviation and marine units, the Safety Office, and field emergency services. Among other

---

[3] The ban also applies to "uniformed or investigatory" employees of the Fairmount Park Commission and the Police Department. No other City employees are subject to the ban. See Phila. Civil Service Reg. 29.037, in Stipulation, at Ex. D.

things, Operations Division employees perform inspections to determine whether properties comply with the Fire Code, and during these inspections uniformed fire fighters work alongside civilian employees of the Philadelphia Department of Licenses and Inspections ("L&I").  Stipulation at ¶¶ 33-36.

The Technical Services Division performs auxiliary services that support fire suppression and emergency medical rescue.  Id. ¶ 37.  One of its sub-parts, the Fire Communications Unit, receives some emergency calls placed through the 911 system and coordinates responses by dispatching the appropriate personnel.  Mostly non-uniformed employees staff the Fire Communications Unit.  Id.  ¶¶ 39-40.  Another part of the Technical Services Division, the Fire Code Unit, oversees the Fire Code, devises responses to unusual hazards, and works closely with L&I, whose employees are not in uniform.  Id. ¶¶ 41-44.

On behalf of the Administrative Services Division, a primarily civilian staff performs "all administrative functions, including personnel; budget, finance and accounting; management information services; purchasing and stores; building management; and special projects" for the Fire Department.  Id. ¶ 45.  The director of this Division, Deputy Commissioner William J. McNulty, is a civilian employee.  Id. ¶ 46.

Lastly, the Emergency Services Division uses both uniformed and non-uniformed employees to administer pre-hospital emergency transportation and medical care.  This Division also formulates guidelines for physicians responding to multi-casualty

4

accidents. Dr. C. Crawford Meechum, its director, is a non-uniformed employee. Id. ¶¶ 48-50.

    C.    FIREPAC

On July 29, 1987, plaintiff Philadelphia Fire Fighters' Union, International Association of Fire Fighters, Local 22, AFL-CIO ("Local 22" or "Union") registered FIREPAC as a political action committee. Local 22 formed FIREPAC as a conduit through which to channel financial support for candidates who identify with and support issues related to the fire service and who share the goals of Local 22 and its members. In the past, FIREPAC has supported causes such as the recognition of Hepatitis C as a work-related disease for emergency service personnel, assuring safe and adequate levels of staffing for the fire service, and winning cost-of-living increases in retired Fire Department employees' pensions. Id. ¶¶ 59-61.

Since July 1987, only retired Philadelphia fire fighters and other non-uniformed personnel have contributed to FIREPAC because the City Charter, the Civil Service Regulations, and the Fire Department memorandum prohibit uniformed Department employees, including active members of Local 22, from contributing. Id. ¶ 63. But for the ban on political contributions, the individual plaintiffs[4] would make

---

[4] The individual plaintiffs are Thomas O'Drain, a uniformed Fire Lieutenant for the Fire Department on leave of absence and serving as the President of the Union; Gerard Kots, a uniformed Lieutenant for the Fire Department serving as First Vice-President of the Union; and Anthony Cubbage, a uniformed Lieutenant for the Fire Department serving as Second-Vice
(continued...)

contributions to FIREPAC and other political candidates and causes of their choosing.  Id. ¶ 69.  Local 22 would also collect voluntary contributions from its members and distribute them to FIREPAC, but it has refrained from doing so because of the ban. Id. ¶¶ 6, 68. Lacking significant financial support, FIREPAC makes only small and sporadic contributions to further its political goals.  Id. ¶¶ 64-65.

In contrast, unions that represent other City employees, such as AFSCME DC 33 and AFSCME DC 47, have political action committees that operate unencumbered by the anti-contribution rules.  These political action committees can and do accept contributions from their rank and file.  Id. ¶¶ 66-67.

Plaintiffs challenge the ban on political contributions under the First and Fourteenth Amendments.  In Count I, they assert that the ban infringes upon their freedoms of speech and association under both Amendments.  In Count II, they argue that the ban deprives them of equal protection of the law under the Fourteenth Amendment because it prevents uniformed Fire Department employees from making political contributions while allowing civilian Fire Department employees and other City employees to contribute.  In Count III, they point out that the ban forecloses political contributions regardless of object, timing, or amount, and maintain that it is thus void for overbreadth under the First and Fourteenth Amendments.

---

[4](...continued)
President of the Union.  Stipulation ¶ 1.

Plaintiffs seek a declaratory judgment that the ban on political contributions by uniformed Fire Department employees and paramedics constitutes a violation of the First and Fourteenth Amendments.  They also seek a permanent injunction barring enforcement of the anti-contribution regime.

Analysis

    A.   First Amendment[5]

A contribution to a political cause constitutes speech and association that the First Amendment protects.  See Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 386-88 (2000); see also Buckley v. Valeo, 424 U.S. 1, 21 (1976) (observing that "[a] contribution serves as a general expression of support for the candidate and his views"); Federal Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 495 (1985) (noting that "contributors obviously like the message they are hearing . . . and want to add their voices to that message; otherwise they would not part with their money").

Expression in the political arena occupies the core of First Amendment protection.  See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982); see also Connick v. Myers, 461 U.S. 138, 145 (1983) (emphasizing "the Constitution's special concern with threats to the right of citizens to participate in political affairs"); Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)

---

[5] Plaintiffs invoke the First Amendment, as made applicable to the States through the Fourteenth Amendment.  Cantwell v. Connecticut, 310 U.S. 296 (1940).

("Speech concerning public affairs is more than self-expression; it is the essence of self-government.").

In <u>United States v. Nat'l Treasury Employees Union</u>, 513 U.S. 454, 467 (1995) ("<u>NTEU</u>") the Supreme Court articulated the standard for evaluating a governmental employer's regulation of "a broad category of expression by a massive number of potential speakers."; <u>see also</u> <u>Swartzwelder v. McNeilly</u>, 297 F.3d 228, 235 (3d Cir. 2002); <u>Latino Officers Ass'n v. City of New York</u>, 196 F.3d 458, 463-65 (2d Cir. 1999). For the regulation to be upheld, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." <u>NTEU</u>, 513 U.S. at 468. Our Court of Appeals has further explained that a "tailoring requirement" was "implicit" from the <u>NTEU</u> analysis. <u>Swartzwelder</u>, 297 F.3d at 236.

Under <u>NTEU</u>, we must balance the uniformed fire fighters' interest in present and future expression against the City's interest in minimizing the impact on City operations. In establishing its interest, the City must demonstrate that its "recited harms are real, not merely conjectural, and that the regulation[s] will in fact alleviate these harms in a direct and material way." <u>NTEU</u>, 513 U.S. at 475 (quotations omitted). To meet this burden, the City suggests two ways in which the ban on uniformed Fire Department employees' voluntary political

contributions alleviates "real" threats that the City would otherwise face.

First, the City contends that, without the ban on uniformed fire fighters' political contributions, the recipients of those contributions (<u>i.e.</u>, politicians) would use their authority to improperly influence hiring, promotion, and transfers within the Fire Department.[6]  In support of this argument, the City proffers letters from local politicians and political functionaries to Fire Commissioner Hairston that request placement of job applicants in the Fire Department. Stipulation at ¶ 56, Ex. H.  However, the City has conceded that, despite the politicians' intercessions, Fire Commissioner Hairston relied on detailed protocols for making personnel decisions and declined to promise any special treatment for any of the applicants.  Stipulation at ¶¶ 57-58; Hairston Dep. at 42-55.  The City has brought to our attention no example of a successful attempt to circumvent the existing civil service rules governing personnel decisions.

The proffered correspondence shows that politicians will attempt to influence personnel decisions even when they do not receive campaign contributions from applicants.  It also demonstrates that politicians do not usually succeed in corrupting the Fire Department's admirable commitment to a

---

[6] At the outset, this problem appears overstated because some 17,000 City employees are not subject to the ban on political contributions, but the City does not suggest that these employees have been hired, promoted, or transferred for reasons unrelated to their merit.

meritocratic personnel system.  The City has failed, however, to forge the final link in the required logical chain.  It has not shown <u>how</u> its laudable commitment to meritocracy depends upon forbidding uniformed Fire Department employees from making political contributions.  The City has offered no evidence to suggest that freedom to give money to politicians would pollute or somehow impair the Fire Department meritocracy.[7]

As a second justification for the ban, Fire Commissioner Hairston maintains that allowing uniformed Department employees to make donations to their chosen political candidates would compromise the integrity of Fire Code inspections.  Hairston Dep. at 35, in Stipulation at Ex. E ("We get opportunities all the time to go out and do things in the community.  One of those things is to do inspections, and it may in some way influence the outcome of an inspection, which could be inappropriate.").  If Fire Department employees received contributions from property owners during inspections, the Fire Department could legitimately raise concerns about bribery.  But Fire Commissioner Hairston's statement fails to explain how Department employees making contributions could inappropriately influence the inspections.  Even if the City could delineate such a link -- and it has not -- it does not address the everyday reality that civilian L&I employees, who are not subject to the

---

[7] We might add that, to the extent it had any persuasive power, the City's argument applies only to promotions and transfers, not to hiring.  By definition, people seeking jobs with the Fire Department are not uniformed employees and are not therefore subject to the political contribution ban.

anti-contribution rules, conduct fire inspections in conjunction with the uniformed Fire Department employees. There is nothing in this record that would support any notion that the only reason L&I employees are honest is because the Fire Department employees at their side are politically neutered.

While the City has presented no persuasive evidence of how uniformed Fire Department employees' voluntary political contributions would "necessar[ily] impact on the actual operation of [g]overnment," NTEU, 513 U.S. at 468 (quotations omitted), present and future uniformed Fire Department employees do have weighty interests in freely contributing to the candidates and causes of their choice. The City Charter, Civil Service Regulations, and Fire Department rules currently prevent those uniformed fire fighters from contributing to political causes that they find worthy. For example, they may not contribute to FIREPAC, and that organization, as a result, lacks the funding to amplify their individual voices by lobbying effectively for their collective benefit.

We must also consider the ban's effect on the general public. NTEU, 513 U.S. at 468, 470. Just as the public has an interest in the message that medical associations and bar associations disseminate about, say, health care reform, it also has an interest in the message disseminated by Fire Department employees about, say, fire hazards, prevention, and rescue. When the City prohibits Fire Department employees from effectively communicating with the public, it shuts off a knowledgeable source on many important matters of societal concern.

The City has therefore failed to show that its interest in banning voluntary political contributions by uniformed Fire Department employees outweighs those employees' interests, and those of the public, in free political speech. Thus, the anti-contribution rules violate the First Amendment.

To avoid this conclusion, the City cites <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976), in which the Supreme Court upheld the Federal Election Campaign Act's $1,000 limit on federal campaign contributions. The City analogizes its ban of contributions to the $1,000 cap on contributions at issue in <u>Buckley</u>. Specifically, it suggests that the Supreme Court's description of the cap -- as "only a marginal restriction upon the contributor's ability to engage in free communication" and as "involv[ing] little direct restraint on . . . political communication" -- applies equally well to the ban at issue here. <u>Buckley</u>, 424 U.S. at 20-21; <u>see also</u> Def.'s Mem. Supp. Mot. Summ. J., at 15-16. This argument glosses over the inconvenient fact that in <u>Buckley</u> the Supreme Court recognized the important distinction between prohibiting contributions and limiting them:

> A limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. <u>A contribution serves as a general expression of support for the candidate and his views</u>, but does not communicate the underlying basis for the support. <u>The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing</u>. . . . A limitation on the amount of money a person may give to a

12

> candidate or campaign organization thus
> involves little direct restraint on his
> political communication, for it permits the
> symbolic expression of support evidenced by a
> contribution but does not in any way infringe
> the contributor's freedom to discuss
> candidates and issues.

Buckley, 424 U.S. at 20-21 (emphasis added).

Under this reasoning, capping the amount of political contributions entails only "marginal restriction" on individuals' ability to express their support for a candidate or cause. By contrast, banning political contributions muzzles political voices.[8]

Finally, the City recites the policy concerns that justified the Hatch Act: ensuring impartial execution of the law; avoiding the appearance of corruption; preventing the government from becoming an invincible political machine; and fostering a civil service corps based on merit rather than patronage. See U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 564-67 (1973). The Hatch Act forbids government employees from "tak[ing] an active part in political management or in political campaigns," id. at 550 (quotations omitted), and the Supreme Court has sustained its prohibition of such open acts of partisan political activity, see id. at 556, 567. Though Letter Carriers permits government to restrain its employees from active political action, it does not

---

[8] Even if the City's ban were sufficiently analogous to Buckley's cap, we subject limits on campaign contributions to rigorous scrutiny, see Buckley, 424 U.S. at 14-18; see also Shrink Missouri, 528 U.S. at 386-88, which this ban cannot withstand.

countenance the City's ban on the private act[9] of contributing money or undermine the authority of Buckley, decided three years later.

We will grant summary judgment to plaintiffs as to Count I. Having found that the prohibition of political contributions violates the First Amendment, we decline to consider Count III's alternative First Amendment claim of overbreadth.

### B. Fourteenth Amendment

Plaintiffs next claim that the prohibition on uniformed Fire Department employees' political contributions abridges their rights under the Equal Protection Clause of the Fourteenth Amendment because other City employees may make such contributions.

As a general rule, a legislative classification will be sustained as long as it is rationally related to a legitimate state interest. City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440 (1985); Romer v. Evans, 517 U.S. 620, 631-33 (1996). Still, the government must show some "relation between the classification adopted and the object to be attained." Romer, 517 U.S. at 632.

The City submits that the ban on political contributions exists because it otherwise "may be possible for uniformed . . . firefighters to exercise political influence on

---

[9] Presumably by writing a check or permitting a FIREPAC payroll deduction.

others or to channel governmental favor through political connections, thereby impairing public confidence in government." Def.'s Mem. Supp. Mot. Summ. J., at 19.  While the City unquestionably has a legitimate interest in preserving public confidence in government, it has not shown how banning the voluntary political contributions of uniformed fire fighters advances that legitimate interest.  Moreover, as plaintiffs cogently argue:

> [T]here is no merit to the City's contention that allowing public employees to make political contributions will somehow impair that public confidence.  Indeed, if this were the case then public confidence in government would be virtually non-existent, since the vast majority of public-sector employees already are free to make political contributions.  For example, federal employees, who are subject to the stringent political-activity restrictions of the Hatch Act, are free to make political contributions.  Pennsylvania's state employees, too, can make contributions to promote candidates or issues that they support.  And most of Philadelphia's own civil service employees are similarly free to make voluntary political contributions.  Certainly, then, there is no rational reason to expect that the addition of 2400 firefighters to the hundreds of thousands of employees who already have the right to make political contributions will impair public confidence in government.

Pl.'s Mem. Sup. Mot. Summ. J. at 29-30 (citations omitted).

When so many other public employees freely contribute to candidates and causes they support, we fail to see how the City can show that prohibiting uniformed Fire Department employees from making political contributions rationally relates to the preservation of public confidence in the City's

government.  Indeed, the parties' joint stipulations of fact underscores the arbitrariness of the City's classification.  For example, uniformed and non-uniformed employees staff the Emergency Services Division, but only uniformed employees are subject to the political contribution ban.  Stipulation ¶¶ 48-50.  Non-uniformed employees populate the Fire Department from its highest to its lowest levels, and their freedom to make political contributions has not diminished public confidence in the Department.  Stipulation ¶¶ 33-50.

The City has failed to offer a persuasive reason why uninformed fire fighters should not have the same rights as the civilians who work beside them.  Thus, the City's ban on political contributions from uniformed Fire Department employees violates the Equal Protection Clause of the Fourteenth Amendment because it lacks a rational relationship to a legitimate state interest.  We will therefore grant summary judgment to plaintiffs as to Count II.

An appropriate Order follows.